IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

ARCTURUS INTERNATIONAL LLC,

Plaintiff,

v.

DARLENE GELLER-STOFF,

Defendant.

CIVIL ACTION FILE
NO. 1:21-CV-5155-TWT

## OPINION AND ORDER

This action involves claims for breach of contract, unjust enrichment and breach of fiduciary duty arising out of the breakup of the relationship between Darlene Geller-Stoff and David Weisman. It is before the Court following a bench trial conducted from May 28, 2024, to June 3, 2024. Having considered the parties' presentation of evidence at trial and their proposed findings of fact and conclusions of law, the Court makes the following findings of fact and conclusions of law.

## Findings of Fact

### 1.

Plaintiff Arcturus International LLC is a Delaware limited liability company that is authorized to do business in Georgia. (Compl., Doc. 1-1, ¶ 4). Since 2016, Arcturus has had no members who were residents or citizens of Georgia. (Amendment to Removal & Answer, Doc. 85, at 1-2; Tr. Day 1, at 40:19-21).

2.

Defendant Darlene Geller-Stoff is a citizen of Georgia. (Notice of Removal, Doc. 1, at 6; Compl. ¶ 5).

3.

Third-Party Defendant David Weisman is a citizen of California. (Amendment to Removal and Answer at 2).

4.

The amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

5.

Arcturus was formed in Delaware on June 7, 2013, and the initial operating agreement was executed on June 14, 2013. (Def. Ex. 40, 80). The initial members of Arcturus were Tom Seletos, Davro LLC, and Delta Alpha X-Ray LLC. (Def. Ex. 80). Tom Seletos is a family friend of Weisman and has been for 25 years. (Tr. Day 1, at 125:18-21). According to the initial operating agreement, executed on June 14, 2013, for Arcturus, Tom Seletos made a capital contribution of $5,000.00 in exchange for a 15% ownership interest; Davro, LLC made a capital contribution of $1,000,000.00 in exchange for a 51% ownership interest; and Delta Alpha X-Ray, LLC made a capital contribution of $1,000,000.00 in exchange for a ownership 34% interest. (Def. Ex. 80; Doc 97 at 123:8-125:17.) Weisman testified that neither Davro, LLC nor Delta Alpha X-Ray, LLC contributed $1,000,000.00 in cash at that time as a capital

2

contribution. (Tr. Day 1, at 124:17 – 125:17). From the beginning, the Plaintiff Arcturus was a phony company funded by phony contributions. It was and is the mere instrumentality of Weisman. Thereafter, membership in Arcturus was transferred to various other individuals pursuant to Weisman's scheme to conceal his assets from creditors. All of the transfer and assignment consideration numbers are probably phony numbers made up by Weisman.

6.

On June 20, 2013, Arcturus purchased a property located at 11825 Mt. Laurel Drive in Roswell, Georgia ("the Mt. Laurel Property"). (Tr. Day 1, at 126:6-12). Weisman began living there with Seletos and neither paid rent, claiming that it was an investment for Arcturus and that they were renovating the house. (*Id.* at 128:21-129:11). The purchase of the Mt. Laurel Property by Arcturus and its use for Weisman's personal benefit was part of Weisman's scheme to conceal assets from his creditors while continuing his lavish lifestyle.

7.

At the time Arcturus was formed, litigation was pending in a California state court involving Weisman, Davro, and Delta Alpha X-Ray. (Tr. Day 1, at 113:2-114:2). Weisman was a member of Davro at the time. (*Id.* at 112:19-113:1). He was also affiliated with Delta Alpha X-Ray. (*Id.* at 122:22-123:3).

8.

On February 1, 2014, Arcturus's operating agreement was amended to remove Davro and Delta Alpha X-Ray as members. (Def.'s Ex. 42). On July 15, 2014, Davro sold its shares of Arcturus to Arcturus. (Def.'s Ex. 46). From that point on, neither Weisman nor any entities he was involved with held an ownership interest in Arcturus. (Tr. Day 1, 46:18-50:8). These transactions were part of Weisman's scheme to conceal assets and defraud creditors.

9.

On January 12, 2015, a Second Amendment to the Operating Agreement for Arcturus was executed, which added Sandy Bartlett, Rod Wilson, and Christina Martin as members in addition to Tom Seletos. (Def.'s Ex. 43). Sandy Bartlett was the contractor that did most of the renovations on the Mt. Laurel Property. (Tr. Day 1, at 133:24-134:5). Rod Wilson is a real estate developer and a long-time business associate of Weisman. (*Id.* at 134:11-15). Christina Martin is Weisman's ex-wife. (*Id.* at 134:18-20). This transaction was part of Weisman's scheme to conceal assets and defraud creditors.

10.

On February 13, 2015, the California state court found Weisman liable for fraud and breach of fiduciary duty and found Davro and Delta Alpha X-Ray liable for breach of contract. (Def.'s Ex. 233). The court also found that "Weisman, both individually and through his alter ego entities, Davro and

DAX,[1] acted with malice, oppression and fraud entitling Plaintiffs to punitive damages." (*Id.*, at 40). The court ultimately entered judgment against Weisman and Davro in the amount of $7,633,845.95 and against Delta Alpha X-Ray in the amount of $1,000,000.00. (Def.'s Ex. 48). Delta Aliraq, Inc., which obtained the judgment, assigned the judgment to ULRS, Inc. dba United Legal Group. (*Id.*). Weisman was cross examined at length about the finding of the California judge: "Weisman, as a witness, also consistently demonstrated a facile indifference to the truth. The following non-exhaustive list of outright misrepresentations demonstrate why Weisman's testimony is completely incredible and should be disregarded." (Tr. Day 1, at 106:22 – 111:24; Def.'s Ex. 233).

### 11.

Arcturus has been sued in multiple jurisdictions for fraudulent transfers since the California judgment. (Tr. Day 1, at 120:8-22).

### 12.

On March 20, 2015, Seletos sold his shares of Arcturus to Newport Investment Partners, LLC, which was run by Rod Wilson. (Def.'s Ex. 13; Tr. Day 1, at 138:10-12). This sale occurred after Seletos was sued in his personal capacity by Weisman's judgment creditors. (Tr. Day 1, at 140:18-25).

---

[1] Delta Alpha X-ray is the military phonetic spelling of DAX. (Tr. Day 1, at 122:14-19). Dax is also Weisman's nickname. (*Id.* at 122:20-21).

13.

Geller-Stoff and Weisman first met in 2013. (Tr. Day 3, at 88:5-6). They casually dated until about November 2014. (*Id.* at 88:19-25).  After that point, they had little contact other than to wish each other happy holidays until Weisman sent Geller-Stoff a text message in September 2015. (*Id.* at 89:11-16). After that text message, they had dinner with Pierce Kirby, who was a business associate of Weisman and who Geller-Stoff met for the first time. (*Id.* at 89:24-90:1; Tr. Day 1, at 40:14-18). After that dinner, they occasionally saw each other but did not start dating seriously until January 2016. (Tr. Day 3, at 90:2-12). Geller-Stoff believed they were in an exclusive romantic relationship starting around March or April of 2016. (*Id.* at 90:13-16).

14.

In March 2016, Anderlex Holdings LLC was formed by Weisman. (Tr. Day 1, at 146:10-12; Tr. Day 3, at 99:7-9). This company was formed to aid Weisman in his scheme to conceal assets and defraud creditors while maintaining a lavish lifestyle.

15.

Weisman told Geller-Stoff that Anderlex was a company that Weisman and Geller-Stoff would use to explore business opportunities. (Tr. Day 3, at 95:5-9, 96:12-17).

16.

Weisman had the idea to start Anderlex. (Tr. Day 3, at 94:1-2).

6

17.

Weisman had named the company before he even mentioned it to Geller-Stoff and had already prepared the paperwork. (Tr. Day 3, at 94:3-7).

18.

Originally, Anderlex's members included Geller-Stoff, Kirby, Paul Connor, and Michael Carpenter. (Def.'s Exs. 166; 170). Connor and Carpenter were immediately removed as members (Def.'s Ex. 170).

19.

Geller-Stoff did not know who Connor or Carpenter were and had only met Kirby a few times. (Tr. Day 3, at 94:9-16).

20.

Neither Weisman nor Arcturus were included as a member of Anderlex because Weisman feared that his judgment creditors from the California litigation would sue Anderlex to collect the judgment if they were members. (Tr. Day 1, 151:10-153:11). This was part of Weisman's scheme to conceal assets and defraud creditors while maintaining a lavish lifestyle.

21.

Anderlex had a checking account (6042) and an investment account (55N24), both with Bank of America. (*See, e.g.*, Pl.'s Ex. 1; Def.'s Ex. 63).

22.

Weisman caused Anderlex to be funded with three deposits totaling $1,491,990. (Tr. Day 1, at 51:6-9). First, a $250,000 cashier's check from

7

Arcturus was deposited on April 8, 2016. (Pl.'s Ex. 1; Tr. Day 4, at 88:12-14). Second, on May 25, 2016, Dan Rizzo, attorney at law, wired $889,490 to Anderlex. (Pl.'s Ex. 2). Third, Trade Capital LLC wired $352,500 to Anderlex on December 16, 2016. (Pl.'s Ex. 4). There was no credible testimony that all of this money came from Arcturus.

23.

There is no dispute that the $250,000 deposit came from Arcturus. (Tr. Day 1, at 49:1-6; Tr. Day 4, at 88:12-14).

24.

Weisman testified that the other two deposits also came from Arcturus. (Tr. Day 1, at 50:25-51:2). Geller-Stoff testified that she believed those deposits were Weisman's money. (Tr. Day 4, at 89:15-20). Weisman's testimony is unreliable.

25.

In emails to Geller-Stoff, Weisman never stated that all of this money came from Arcturus. In one email sent the day before the third deposit, Weisman wrote to Geller-Stoff, "I'll deposit $350K in the account tomorrow." (Def.'s Ex. 39). He made no mention of Arcturus. Then on February 22, 2017—after all the deposits were placed in the account—Weisman emailed Geller-Stoff an accounting of Anderlex's expenses that, in part, "details repayments to Arcturus International, which as you know initially funded Anderlex with a loan of $250,000." (Pl.'s Ex. 12). He made no suggestion that

any of the other money came from or was owed to Arcturus. Weisman treated all of the funds and assets in Anderlex as his own.

26.

The Plaintiff's argument that the money and assets in the Anderlex accounts constituted the "Arcturus Fund" is false. There never was an "Arcturus Fund" until it was made up by Weisman for this litigation. Weisman used the money and assets in the Anderlex accounts for payment of his own personal expenses and to engage in risky and speculative day trading in the stock market. When Geller-Stoff put cash and stocks into the Anderlex accounts (Def.'s Ex. 107 at p. 11; Def.'s Ex. 63, p. 31), her cash and stocks were commingled with Weisman's assets, and all were used to maintain Weisman's lavish lifestyle and support his risky day trading in the stock market. (Pl.'s Ex. 3, 4, 5).

27.

Nor is there any mention in the transfer agreements of Arcturus having a right to nearly $1.5 million in Geller-Stoff's possession for either of the ownership sales that occurred after 2016. (Def.'s Exs. 241, 243). Weisman testified that Bradfield, LLC, the entity that purchased part of Arcturus in June 2018, was well aware of the property claims that Arcturus is raising in this case. (Tr. Day 2, at 80:5-15, 83:1-10). However, Carolyn Bradfield, the sole member of Bradfield, LLC, denied having known anything about these claims when she purchased Arcturus. (Tr. Day 3, at 51:14-24). At the time that she

became the sole member of Arcturus, it was a shell company having no real value or significant assets. Michael Quackenbush, who purchased Bradfield, LLC's ownership in Arcturus, died before trial and thus did not testify to his knowledge. (Tr. Day 1, at 117:6-7).

28.

Weisman made all the investment decisions and conducted all of the trading for the Anderlex investment account. (Tr. Day 3, at 105:5-23, 111:5-16).

29.

Anderlex closed in September 2017 and the funds were transferred to Geller-Stoff's personal SunTrust banking account, the 8100 account. (Def.'s Ex. 63, 113; Tr. Day 1, at 108:22-23; Tr. Day 4, at 42:10-20). This transfer was pursuant to Weisman's scheme to conceal assets and defraud creditors by exploiting Geller-Stoff's banking relationships and accounts.

30.

Weisman decided that Anderlex should be shut down at that time because he was concerned that his creditors were going to start pursuing it to recover their judgment. (Tr. Day 3, at 108:24-109:11).

31.

At the time the funds were transferred from the 55N24 account, there was $996,700.20 in assets, at least $67,727.70 of which came from Geller-Stoff in the form of stock in Amazon, Seagate, and General Electric. (Def.'s Ex. 63; Tr. Day 4, at 92:24-93-7). The account also had $559,107.11 in margin debt.

10

(Def.'s Ex. 63). Geller-Stoff's assets were subject to this margin debt. The total net value of the assets then was $437,593.09. (*Id.*).  Thus, due to Weisman's withdrawals and day trading losses, the Anderlex accounts lost over a million dollars in value since $1,491,990 was deposited in them.

32.

Along with the transfer from the Anderlex 55N24 account, Geller-Stoff transferred all of her assets that were in her personal SunTrust 7965 account into the 8100 account. (Tr. Day 4, at 45:4-14). Those assets included $4,123.77 in cash, 500 shares of Blackstone stock, shares in two ETFs, and 100 shares of a natural gas ETF. (Def.'s Ex. 127; Tr. Day 4, at 46:8-20). Her assets were commingled with other assets in the account to pay for Weisman's personal expenses and to support his risky and speculative investments.

33.

The 8100 account was involved in speculative active trading using margin, and it concentrated its assets in a couple of stocks rather than a diversified portfolio. (Tr. Day 3, at 11:6-12:9).

34.

Prior to Weisman's involvement, Geller-Stoff was a conservative investor who was building wealth for the long term. (Tr. Day 3, at 9:3-7). Geller-Stoff was not engaged in any speculative trading, day trading, or otherwise high-risk trading until she got involved with Weisman. (*Id.* at 9:8-10:21).

35.

Geller-Stoff testified that she spent approximately $172,000 out of her personal bank account (Bank of America 1523 account) for Weisman's benefit from September 2017 to the end of that year. (Tr. Day 4, at 73:4-9). Geller-Stoff further stated that by May 2018, she had incurred over $345,000 in expenses for Weisman. (*Id.* at 55:24-56:7). She also testified that she spent more than $545,000 out of the 1523 account for Weisman or Arcturus's benefit between June 2018 and March 2020. (*Id.* at 71:25-72:12).

36.

On March 21, 2018, Arcturus entered into a Settlement Agreement and Mutual General Release with Delta Aliraq, who obtained the judgment in the California litigation, and ULRS, who was the assignee of that judgment. (Pl.'s Ex. 18; Tr. Day 2, at 57:13-58:15). Pursuant to that agreement, Arcturus agreed to sell the Mt. Laurel Property, distribute $250,000 of the proceeds to ULRS, and put $322,000 into an escrow account pending the resolution of litigation taking place in Georgia. (Pl.'s Ex. 18). Arcturus received the remaining $73,524.54. (Pl.'s Ex. 22). Geller-Stoff was the sole purchaser of the Mt. Laurel Property. (Pl.'s Ex. 18, 22). The escrow account was in Geller-Stoff's name. This was pursuant to Weisman's scheme to hide assets and defraud creditors.

37.

At the time this Settlement Agreement was made, Rod Wilson—one of

the owners of Arcturus—was being sued by parties related to the California litigation. (Tr. Day 2, 61:7-22).

38.

On May 25, 2018, Geller-Stoff purchased the Mt. Laurel Property for $675,0000. (Pl.'s Ex. 22).

39.

Geller-Stoff took out a $500,000 mortgage in her personal name to purchase the Mt. Laurel Property. (Tr. Day 2, at 65:10-66:9; 133:13-16).

40.

The money for the down payment came from the commingled funds in the 8100 Account which were transferred to Geller-Stoff's personal account before being used for the down payment. (Pl.'s Ex. 27, at 71).

41.

Weisman continued to live in the Mt. Laurel Property after Geller-Stoff purchased it. (Tr. Day 3, at 133:11-13). On May 24, 2018, Weisman signed a lease agreeing to pay rent in the amount of $2,453.54 per month which was the monthly mortgage payment. (Def.'s Ex. 22). Weisman never paid the rent. Geller-Stoff paid the mortgage on the Mt. Laurel Property after she purchased it. She reimbursed herself for a few mortgage payments from the commingled funds in the 8100 account. (Tr. Day 4, at 18:14 – 20:10). Geller-Stoff paid all of the utilities and insurance on the property. (*Id.*, at 20:11-24).

42.

When Geller-Stoff purchased the Mt. Laurel Property, she intended to live there with Weisman by the end of 2018. (Tr. Day 2, at 159:3-7; Tr. Day 3, at 133:8-10).

43.

Geller-Stoff would sometimes stay with Weisman at the Mt. Laurel Property, and they both would sleep in the downstairs master bedroom. (Tr. Day 3, at 133:17-134:1).

44.

Prior to the present litigation, nobody claimed that Arcturus had any right to the Mt. Laurel Property after it was sold to Geller-Stoff.

45.

Weisman testified that Arcturus maintained a claim to the Mt. Laurel Property and that Bradfield knew about it. (Tr. Day 2, at 81:8-14). The Court disregards this testimony as being self-serving and unreliable.

46.

In the transfer agreements for sales of ownership of Arcturus that occurred on June 1, 2018 and September 19, 2019, there is no mention of a claim to the Mt. Laurel Property outside of the sales proceeds from the escrow account created when Geller-Stoff purchased it. (Def.'s Exs. 241, 243). There is no indication of any ongoing claim to the property.

47.

Bradfield also testified that when she purchased ownership in Arcturus, she was unaware of any ongoing claim it had to the Mt. Laurel Property. (Tr. Day 3, at 51:1-13). To the contrary, she stated that she believed Geller-Stoff owned the Mt. Laurel Property completely. (*Id.* at 51:1-5).

48.

In July 2018, Weisman was approached by people in the music business about funding a tour in Mexico by the rock band Deep Purple. After talking to a friend at a party, Weisman agreed to loan the band's promotor $600,000. The money was wired from the commingled funds in the 8100 account into Geller-Stoff's personal bank account and then wired to United Talent Agency, Deep Purple's talent agency. (Pl.'s Ex. 28, at 8, 17-18; Tr. Day 1, at 81:5-8).  On July 30, 2018, Geller-Stoff received a promissory note in her name only as "Lender" for $600,000 (Pl.'s Ex. 26). The promissory note was worthless. The transaction was structured this way pursuant to Weisman's scheme to conceal assets and defraud creditors. Prior to the present litigation, nobody claimed that Arcturus paid any portion of this money.

49.

Geller-Stoff paid the Troutman Sanders law firm $100,000 that she obtained using her home equity line of credit to pay legal fees for Weisman/Arcturus. She also paid Weisman $75,000 to invest in a residential property of his. (Tr. Day 1, at 79:3-22). Weisman gave her a phony "credit" for

15

$175,000 in the Deep Purple loan to avoid paying her back in real money. He claimed that the other $425,000 belonged to him (not Arcturus). (*Id.*). The loan was never repaid and the commingled funds in the 8100 account had a loss of $600,000.

50.

In the transfer agreement from the September 19, 2019 sale of ownership, there is no mention that Arcturus has a claim to any money from the investment in Deep Purple's tour. (Def.'s Ex. 243).

51.

Moreover, in an email in January 2020, Weisman told Geller-Stoff that he would repay her from *his* share of the Deep Purple investment, rather than Arcturus's share. (Def.'s Ex. 69).

52.

In March 2020, there was $32,566.24 remaining in the 8100 account, which Geller-Stoff moved into her personal checking account. (Def.'s Ex. 118; Tr. Day 4, at 70:15-23). The losses in the account were due to Weisman's withdrawals to pay for his personal expenses and his disastrous investment decisions.

53.

As their relationship was breaking up, Weisman made a last desperate attempt to get more money out of Geller-Stoff. In his "Finish Line" investment proposal, Weisman proposed that she withdraw $100,000 from her retirement

16

account to fund his effort to recover $1,353,000 that he claimed was owed to him. Included in this amount was $565,000 "due DW (Weisman) from Big Draw" (the Deep Purple loan). (Def.'s Ex. 66). Weisman's and Geller-Stoff's personal relationship ended in late June 2020. (Tr. Day 3, at 134:2-5).

54.

After the breakup, Geller-Stoff, through counsel, demanded that Weisman and others, such as Weisman's ex-wife Christina Martin, vacate the Mt. Laurel Property and remove all personal belongings from it by January 15, 2021. (Pl.'s Ex. 32).

55.

On January 9, 2021, Weisman—in an effort to stop the imminent eviction—wrote an email to Geller-Stoff in which he stated, *inter alia*, "This is going to get REALLY ugly, Of course ULRS, Suntrust, Bank of America Merrill Lynch, the IRS, and several others will want to get involved and you are about to spend the next 2-3 years under an extraordinarily unflattering microscope. Sadly, your family will be dragged into this mess, as they have material knowledge of the key components of these matters. I cannot imagine what you're thinking, but your actions give Arcturus and others no choice but to recover the very large amounts of money and property that you are holding for them, and now apparently attempting to steal rather than return." (Def.'s Ex. 8). Weisman went on to say, "Your proposed eviction is so egregiously wrong on so many levels and is so offensive to myself and my associates we have no

17

choice but to launch a legal assault against you and your entities that will be extremely expensive and will guarantee you legal and professional penalties/sanctions for years. That's in addition to you repaying a lot of money to more than just us." (*Id.*).

56.

This email is the first time Weisman indicated that Geller-Stoff owed either him or Arcturus any money.

57.

In fact, the record shows that Weisman repeatedly stated that he owed Geller-Stoff money throughout the events in question. (Def.'s Exs. 1, 30, 69, 221; Tr. Day 3, at 136:19-137:14).

58.

Among the money Weisman stated that he owed Geller-Stoff was from an oil energy investors' (OEI) investment in which Geller-Stoff invested $50,000. (Def.'s Ex. 221). Weisman testified at trial that he still owes Geller-Stoff from the investment but stated that he only owed $45,000 because Geller-Stoff agreed to pay $5,000 in expenses. (Tr. Day 5, 35:5-36:11). However, Geller-Stoff testified that Weisman personally guaranteed the entire $50,000 investment. (Tr. Day 4, at 146:2-4). The Court finds Geller-Stoff's testimony more reliable and credits it.

59.

Geller-Stoff filed a Dispossessory Petition in the Magistrate Court of Fulton County, and that Petition concluded with a consent order on September 23, 2021. (Pl.'s Ex. 34). The consent order required Weisman and Arcturus to vacate the Mt. Laurel Property on or before November 10, 2021. (*Id.*).

60.

One of the conditions of his eviction was that all fixtures were to remain in the Mt. Laurel Property.

61.

When Weisman left the Mt. Laurel Property, he took with him art worth a couple thousand dollars, wine worth $25,000, and home theater seating and equipment worth around $50,000-$60,000. (Tr. Day 4, at 22:6-23:8; 81:13-23).

62.

Geller-Stoff and Weisman each claimed at trial to have bought the wine. The bill of lading for the wine was addressed to Geller-Stoff personally. (Tr. Day 5, at 39:23-40:17). Because of this and because Weisman is an unreliable witness, the Court credits Geller-Stoff's testimony.

63.

Weisman also locked the house from the outside and did not provide Geller-Stoff with the keys. (Tr. Day 4, at 23:17-24:2). Geller-Stoff spent over $1,000 on a locksmith to repair the issue. (*Id.* at 24:3-7).

64.

When Geller-Stoff finally did get into the house, there was water damage in many parts of the house, a corner of the counter was broken off, and the refrigerator had been leaking for a while and its feet had sunk into the wooden floor. (Tr. Day 4, at 21:3-13). Geller-Stoff spent over $40,000 repairing the property. (*Id.* at 21:17-21).

65.

Geller-Stoff has also regularly paid her mortgage on the Mt. Laurel Property, and there is no evidence that Weisman or Arcturus have paid for any of it since March 2020 at the latest. (Def.'s Ex. 125; Pl.'s Ex. 24, at 12-13).

66.

Geller-Stoff did not move into the Mt. Laurel Property after the eviction and instead has been renting it out since March 2022. (Tr. Day 2, at 142:5-12).

67.

Zillow estimates the market value of the Mt. Laurel Property at $1,257,000 and Redfin estimates it to be worth $1,300,975. (Pl.'s Exs. 39 & 40). Neither estimate is reliable.

## Conclusions of Law[2]

The Court has jurisdiction over this case because there is complete diversity and the amount in controversy exceeds $75,000. *See* 28 U.S.C.

---

[2] The record citations for any facts discussed below can be found in the Findings of Fact.

§ 1332.[3] In an Opinion and Order dated February 2, 2024 [Doc. 66], the Court granted Geller-Stoff's motion for summary judgment with respect to Arcturus's claims for Specific Performance (Count V) and Breach of Contract (Count VI) relating to the Mt. Laurel Property. In light of the findings of fact deduced from trial, the Court makes the following conclusions of law with respect to the rest of Arcturus's claims and to Geller-Stoff's third-party claims.[4]

## I. Arcturus's Claims[5]

None of Arcturus's claims succeed on the merits. For starters, there is no credible evidence that Geller-Stoff entered into an enforceable contract with Arcturus. Arcturus provided no documents that purported to show a contract had been formed between itself and Geller-Stoff to pay Arcturus for investing in Anderlex or for anything related to the Deep Purple Note. The best that

---

[3] The Defendant impermissibly removed this case as a resident defendant. *See* 28 U.S.C. § 1441(b)(2). However, in the Eleventh Circuit, removal by a resident defendant is a waivable procedural defect. *See Pacheco de Perez v. AT&T Co.*, 139 F.3d 1368, 1372 n.4 (11th Cir. 1998); *Saul v. Sneed*, 413 F. Supp. 3d 1132, 1137-39 (N.D. Ala. 2019). Since the Plaintiff never objected to the removal, the Court concludes that the Plaintiff has waived the issue and that the removal defect does not deprive the Court of jurisdiction.

[4] Geller-Stoff raised counterclaims against Arcturus, but she did not pursue them at trial. Consequently, she does not meet her burden of proof and all of the counterclaims fail.

[5] At the close of Arcturus's case-in-chief, Geller-Stoff made a Motion for Judgment on Partial Findings [Doc. 89] pursuant to Fed. R. Civ. P. 52(c). (Tr. Day 2, at 170:4-175:7). The Court exercised its discretion under Rule 52(c) to decline to render any judgment at the time and instead took it under advisement. (*Id.* at 175:8-12). The Court is now making a judgment at the close of all evidence, which renders Geller-Stoff's Rule 52(c) motion moot. *In re Donnan*, 2013 WL 3992411, at *11 (Bankr. M.D. Ga. Aug. 1, 2013).

Arcturus could present was an email that Geller-Stoff sent to Deutsche Bank stating that Anderlex was started by an investment from Arcturus. (Pl.'s Ex. 9). However, just because Geller-Stoff knew that Arcturus invested in Anderlex does not mean that she entered into a contract with Arcturus to repay any funds. Since there is insufficient evidence that a valid contract was formed between Arcturus and Geller-Stoff, Arcturus's breach of contract claim fails. *See Hernandez v. Rutco, LLC*, 2024 WL 1007426, at *2 (N.D. Ga. Mar. 5, 2024) (reciting "a valid contract" as a necessary element for a breach of contract claim under Georgia law).

Arcturus's breach of fiduciary duty claim similarly fails. There is simply no credible evidence that Geller-Stoff and Arcturus formed any sort of fiduciary relationship. Under Georgia law, a fiduciary relationship arises "either when a party exercises a 'controlling influence over the will, conduct, and interest of another' or when, 'from a similar relationship of mutual confidence, the law requires the utmost good faith.'" *Bush v. Liberty Mut. Ins. Co.*, 361 Ga. App. 475, 479 (2021) (quoting O.C.G.A. § 23-2-58). The evidence presented at trial persuasively shows that Geller-Stoff did not have such a relationship with Arcturus. Throughout the relevant events of the case, Geller-Stoff believed that she was dealing with Weisman, not Arcturus. Nor is there any credible evidence that Weisman purported to act on behalf of Arcturus. All that the evidence shows is that Geller-Stoff bought the Mt. Laurel property at arm's length from Arcturus and knew that Arcturus provided $250,000 to Anderlex

that (as described below) was lost before any money was in Geller-Stoff's personal possession. None of these arise to a level of mutual confidence or controlling influence to form a fiduciary relationship between Arcturus and Geller-Stoff. If Arcturus has any claim for breach of fiduciary duty, it is against Weisman—who squandered away large sums of money through financing his lavish lifestyle and various risky investments—not Geller-Stoff. Because Geller-Stoff did not owe Arcturus any fiduciary duty, Arcturus's claim for breach of fiduciary duty fails. *See Ewing v. Scott*, 366 Ga. App. 466, 472 (2023) (reciting "the existence of a fiduciary duty" as an essential element for a breach of fiduciary duty claim).

With respect to Arcturus's other claims, the Court finds that Arcturus has failed to show by a preponderance of the evidence that Geller-Stoff converted or unjustly kept any of Arcturus's money. For starters, throughout this lawsuit Arcturus has been calling the nearly $1.5 million that funded Anderlex the "Arcturus Fund," but there was no such thing as an Arcturus Fund until Weisman came up with the idea as a way to pursue this litigation in the name of Arcturus. There was just a pot of money that Weisman kept moving around to avoid paying his judgment creditors. To the extent that Arcturus has a claim to any of the money that was used to fund Anderlex, the reliable evidence shows that it only amounted to $250,000. However, by the time Anderlex had closed down in September 2017, it had lost over a million dollars. Given the way that Weisman intermingled funds, it is impossible for

the Plaintiff to meet its burden to show that any of Arcturus's money even made it into the 8100 account. Moreover, Geller-Stoff has testified to spending hundreds of thousands of dollars for Weisman and/or Arcturus's benefit. This is corroborated by the fact that, until Geller-Stoff threatened to evict Weisman, all of the debt-related discussions between Geller-Stoff and Weisman were about how Weisman was going to repay Geller-Stoff what he owed her, not vice versa. Despite (or perhaps because of) this, Arcturus did not produce a forensic accountant or any other expert to sort out where the money came from or how the money was lost or spent. For failure to meet its burden of proof, any claims stemming from the alleged misuse or misappropriation of the so-called "Arcturus Fund" fail. The Plaintiff's Proposed Findings of Fact and Conclusions of Law admit this in footnote 7. The statement in this footnote that Geller-Stoff "pocketed" $425,000 from the Deep Purple loan is completely false.

Arcturus also has not met its burden for any claims related to the Mt. Laurel Property. Arcturus's assertion that Geller-Stoff did not put anything into the purchase of the Mt. Laurel Property is simply false. She borrowed $500,000 to purchase the property for enough money for Weisman to buy off one of his creditors, to put up collateral for another case, and still have money to spare that went to Arcturus. Moreover, even if the down payment did not come from her own money, the Court cannot conclude that it came from Arcturus for the same reasons as stated above. There was no written

24

agreement for Geller-Stoff to convey the house back to Arcturus. There was no credible evidence even of a verbal agreement. Neither Arcturus nor Weisman can avoid the application of the Statute of Frauds. Their claim that Weisman possessed the Mt. Laurel Property pursuant to an agreement to reconvey the property to Arcturus completely fails. If Weisman was paying the mortgage or other expenses while he was living there, that does not mean Geller-Stoff was unjustly enriched, even if—unbeknownst to Geller-Stoff—Weisman used Arcturus's money to do so. Furthermore, there is not any evidence that Geller-Stoff has been repaid any money she has spent maintaining or renting the house since March 2020 at the latest, even though Weisman was living there until November 2021. Finally, the fact that the value of the house has increased substantially since the purchase in 2018 does not mean Geller-Stoff was unjustly enriched; it simply means she made a good investment decision and Weisman made a bad one. Any claims related to the Mt. Laurel Property fail.

All of the Plaintiff's equitable claims, including unjust enrichment and money had and received, are barred by the affirmative defense of unclean hands. The unclean hands maxim does not normally permit any recovery on the part of the plaintiff. The maxim, if applicable, requires the district court to halt petitioner at the threshold and refuse it any relief whatsoever—not to compromise with it. *West v. West*, 825 F. Supp. 1033, 1049 (N.D. Ga. 1992); *see also Dixon v. Murphy*, 259 Ga. 643, 644 (1989). Anderlex and Arcturus were

the instrumentalities of Weisman for concealing assets and defrauding creditors. Any claims by Arcturus against Geller-Stoff are barred by the doctrine of unclean hands. Finally, Arcturus's claims for punitive damages and attorney's fees are derivative to its substantive claims. *See Stephen A. Wheat Tr. v. Sparks*, 325 Ga. App. 673, 682 (2014). Since all of Arcturus's substantive claims fail, it is not entitled to punitive damages or attorney's fees.

## II. Geller-Stoff's Third-Party Claims

### A. Fraud (Count 1)

Geller-Stoff's first claim against Weisman is for fraud. Under Georgia law, fraud has the following five elements: "(1) a false representation or omission of a material fact; (2) scienter; (3) intention to induce the party claiming fraud to act or refrain from acting; (4) justifiable reliance; and (5) damages." *Meyer v. Waite*, 270 Ga. App. 255, 257 (2004) (citation omitted). The evidence on record indicates that Weisman took advantage of Geller-Stoff's feelings for him and repeatedly misrepresented to Geller-Stoff his intentions with respect to Anderlex, the Mt. Laurel Property, and more. He knowingly did so to induce Geller-Stoff into helping him evade his creditors and maintain his lifestyle. Up to some point, Geller-Stoff justifiably relied on Weisman's representations, believing him to be her partner who had her best interests at heart. Such reliance has certainly caused Geller-Stoff damages, but those damages were not quantified at trial. Consequently, the Court will grant judgment in favor of Geller-Stoff on her claim of fraud and award her nominal

damages in the amount of $10.

### B. Money Had and Received (Count 2) and Breach of Contract (Count 3)

As to her breach of contract claim, the Court will grant judgment in favor of Geller-Stoff. Weisman personally guaranteed that he would repay Geller-Stoff for her $50,000 OEI investment but has failed to do so. It is undisputed that Weisman owes Geller-Stoff for this investment. Weisman asserted at trial that his guarantee was only $45,000 because of expenses that had to be paid, but the Court does not credit that testimony. Accordingly, the Court grants judgment on this count to Geller-Stoff in the amount of $50,000. Geller-Stoff has not met her burden for showing that any other money is owed to her under her claim of money had and received. The Court thus grants judgment on that count to Weisman.

### C. Breach of Personalty (Count 4)

Geller-Stoff's final substantive claim against Weisman is for injury to personalty related to Weisman's taking of the home theater seating and equipment, artwork, and wine from the Mt. Laurel Property as well as locking her out and leaving the Property in a state of disrepair. Under Georgia law, an owner of personal property may "recover damages from any person who willfully damages the owner's personal property or who commits a theft as defined in Article 1 of Chapter 8 of Title 16 involving the owner's personal property." O.C.G.A. § 51-10-6. As to the artwork, home theater seating, and home theater equipment, Geller-Stoff did not provide any testimony or

documentary evidence that she purchased those items. Instead, she argues Weisman violated the eviction condition that required all fixtures to stay in the Mt. Laurel Property. "Anything which is intended to remain permanently in its place even if it is not actually attached to the land is a fixture which constitutes a part of the realty and passes with it." O.C.G.A. § 44-1-6(a). "Machinery which is not actually attached to the realty but is movable at pleasure is not a part of the realty." O.C.G.A. § 44-1-6(b). There is insufficient evidence that the artwork or the home theater equipment and seating were fixtures. There is no reason to think that the artwork was intended to remain in its place permanently. As to the home theater items, the Court could imagine those items being fixtures, but Geller-Stoff did not put on any evidence describing the items, stating how they were attached (if at all) to the property, or providing a basis for concluding that they were intended to remain in the Property permanently. Consequently, Geller-Stoff's claim as to those items fail.

As for the wine, Geller-Stoff states that she has a right to it because she purchased it. The Court finds the statement that she purchased the wine credible. There is no dispute that Weisman took the wine from the Mt. Laurel Property and has not paid Geller-Stoff for it or returned it. The Court therefore finds that Geller-Stoff is entitled to compensatory damages for the value of the wine, which the evidence shows was $25,000. Furthermore, Weisman does not contest that he must reimburse Geller-Stoff for the repairs she needed to do

after he vacated the property. (*See* Pl.'s Proposed Findings of Fact and Conclusions of Law, at 56). The Court will thus award $40,000 to Geller-Stoff for the repairs plus the $1,000 she spent on a locksmith when Weisman locked her out of the Mt. Laurel Property. In total, the Court will grant judgment in favor of Geller-Stoff on her injury to personalty claim in the amount of $66,000.

### D. Punitive Damages (Count 5) and Attorney's Fees (Count 6)[6]

Given that at least some of Geller-Stoff's substantive claims succeed, the Court turns to her prayer for punitive damages and attorney's fees. Georgia law provides that "[p]unitive damages may be awarded only in such tort actions in which it is proven by clear and convincing evidence that the defendant's actions showed willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences." O.C.G.A. § 51-12-5.1. The Court declines to award Geller-Stoff punitive damages on any of her claims. She was a willing participant in Weisman's schemes to hide assets and defraud creditors. If willing participant is too strong a description, she certainly shut her eyes to what he was doing.

On the other hand, the Court finds that an award of attorney's fees is appropriate in this case. Georgia law allows for attorney's fees against a

---

[6] In the Third-Party Complaint, the Third-Party Plaintiff made a scrivener's error and labeled both her injury to personalty claim and claim for punitive damages as "Count 4." The Court treats her claim for punitive damages as Count 5 and her claim for attorney's fees as Count 6.

defendant that "has acted in bad faith, has been stubbornly litigious, or has caused the plaintiff unnecessary trouble and expense." O.C.G.A. § 13-6-11. As described above, Weisman repeatedly told Geller-Stoff that he owed her money and described plans for how he was going to pay her back. It was only when Geller-Stoff demanded that Weisman leave the Mt. Laurel Property that Weisman began to claim that she owed him money. In response to Geller-Stoff's demand, Weisman told her to stop the eviction immediately, and, if she did not, he threatened to "launch a legal assault" against her that would put her "under an extraordinarily unflattering microscope" and that Geller-Stoff's "family [would] be dragged into this mess." (Def.'s Ex. 8). Given this evidence, the Court finds that Weisman's pursuit of these claims on Arcturus's behalf was done in bad faith to intimidate and harass Geller-Stoff for evicting him from the Mt. Laurel Property and that this has caused Geller-Stoff unnecessary trouble and expense. The Court thus orders Weisman to pay Geller-Stoff's attorney's fees in this case. The Court gives Geller-Stoff thirty (30) days from the date of this Order to file affidavits and time records to support her claim for reasonable attorney fees.

## Conclusion

For the foregoing reasons, the Clerk is hereby DIRECTED to enter Judgment in favor of the Defendant on all Counts of the Plaintiff's Complaint and to enter Judgment in favor of the Plaintiff on all counterclaims. With respect to the Third-Party Complaint, the Clerk is DIRECTED to enter

Judgment in favor of the Third-Party Plaintiff on Counts 1, 3, 4, and 6 and in favor of the Third-Party Defendant on Counts 2 and 5. The Defendant's Motion for Judgment on Partial Findings [Doc. 89] is DENIED as moot.

SO ORDERED, this  18th   day of September, 2024.

THOMAS W. THRASH, JR.
United States District Judge